**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Sudberry, et al., | No. CV09-0779-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| State of Arizona, et al., | |
| Defendants. | |

Before the Court is Defendant City of Phoenix's Motion for Summary Judgment (doc. # 47).

**I.     Legal Standard for Summary Judgment**

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce evidence and show there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law. *Id*. at 248. A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The party seeking summary judgment bears the initial burden of identifying the basis for its motion and those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden, the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*

On summary judgment, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the nonmoving party produces direct evidence of a genuine issue of fact, the Court does not weigh such evidence against the moving party's conflicting evidence, but rather denies the motion and leaves the issue to the trier of fact for resolution. *Id.*

**II.     Facts Presumed True for the Purpose of Deciding the City's Motion for Summary Judgment**

Following a court hearing on December 10, 2007, seventeen-year-old Daniel Byrd ("Byrd"), who had spent years in Juvenile Intensive Probation Services, standard probation, and juvenile treatment or detention facilities, was released to the care and custody of his older half-brother Stephen Byrd and placed on juvenile probation. On December 30, 2007, Stephen Byrd was arrested and detained in Kingman, Arizona, on drug and weapons charges.

On January 10, 2008, Officer Douglas Beland of the Phoenix Police Department responded to a call from Moon Valley High School regarding an assault and theft purportedly committed by Byrd against his seventeen-year-old ex-girlfriend, Kaitlyn

1   Sudberry ("Kaitlyn"). Kaitlyn and Byrd had dated for a year or two until they broke up in
2   approximately late December 2007.
3       Officer Beland's report indicates that Kaitlyn said that on January 10, 2008, when
4   she was walking through a school common area between classes, Byrd grabbed her
5   sweatshirt and told her she owed him $70. When Kaitlyn denied owing him the money,
6   Byrd grabbed her backpack from her shoulder, took her driver's license from it, and
7   returned the backpack to her. He told Kaitlyn he was going to keep the driver's license
8   until she paid him the money and walked away. Kaitlyn reported the incident to the
9   school's assistant principal who retrieved the driver's license from Byrd and returned it to
10  Kaitlyn. Kaitlyn told Officer Beland that she was not injured and her shirt was not
11  damaged, but she wanted to press charges against Byrd for "grabbing her." Officer
12  Beland obtained Byrd's name, address, and telephone number from the assistant
13  principal, but was unable to speak with Byrd at school that day because Byrd had been
14  suspended.
15      Officer Christopher Granado's report states that on January 11, 2008, Granado was
16  assigned to investigate this case and sent a letter to Kaitlyn's parents to determine
17  whether they wanted to prosecute Byrd or if they were satisfied with the school's
18  intervention. On January 15, 2008, Officer Granado received a message from Kaitlyn's
19  stepmother, Bobbi Sudberry, indicating that she wanted to prosecute Byrd for the January
20  10, 2008 incident.
21      On January 18, 2008, Officer Granado went to the school, pulled Byrd out of class,
22  and spoke to him regarding the January 10, 2008 incident. According to Officer
23  Granado's report, Byrd became irritated that Kaitlyn had reported the incident, raised his
24  voice, and told the officer that Kaitlyn had "tried to run [him] over." Upon being
25  informed of his Miranda rights, Byrd stated he did not wish to waive them, and the
26  interview was stopped. Officer Granado informed Byrd that he would be submitting
27  charges against Byrd for theft and Byrd was free to return to class.
28

On January 22, 2008, on school grounds, Byrd reportedly grabbed Kaitlyn by the straps of her backpack, shook her, and yelled at her. Kaitlyn said Byrd screamed at her, "Why are you pressing charges?" and "You don't care that my life is crap." A witness said Byrd appeared to be very angry and screamed at Kaitlyn, "You need to understand," while Kaitlyn kept yelling, "Let go of me." Teachers interceded, and Byrd was suspended from school. School staff communicated to police that Byrd had "a high tendency for violence."

Also on January 22, 2008, the Phoenix Police Department received a telephone call from Byrd's biological mother, Lucille Revelles, who stated that Byrd was distraught and had made a verbal threat to murder Kaitlyn and take his own life. After the call, Officer James Walik went to Byrd's residence three different times that day to check Byrd's welfare, but Byrd was not there, and his location was unknown.

On January 23, 2008, Sergeant Roger Heinrich met at school with the assistant principal. They spoke with Byrd by telephone. Byrd told them he hated Kaitlyn, but he was not going to kill her. The assistant principal informed Byrd that he was going to be suspended and transferred to a different school. Sergeant Heinrich did not inform Byrd that he was sending police officers to arrest him. Sergeant Heinrich anticipated that Byrd may have had a weapon. Five officers went to Byrd's residence to arrest him, but they received no answer at the door.

On January 23, 2008, Sergeant Heinrich also contacted Bobbi Sudberry, told her that he thought the threat was real, advised that she obtain an order of protection for Kaitlyn, and recommended keeping Kaitlyn home from school. Kaitlyn stayed home from school that day. Sergeant Heinrich also contacted Byrd's probation officer and informed her of the assaults and threat. Further, Sergeant Heinrich assigned police officers to cover the school throughout the remainder of the school day.

Also on January 23, 2008, Officer Granado spoke with Bobbi Sudberry who told the officer that two additional incidents, an assault and a threat, had occurred off school grounds the day before. Officer Granado determined that these incidents were being

investigated by the Assaults Unit. Although Officer Granado was unable to reach the assistant principal, he was able to speak to Officer Thomas Hitaffer, who was at the school and had just called in the assault report. Officers had gone to Byrd's residence, but were not able to find Byrd there. For two days a uniformed police officer patrolled in front of the high school, both to serve as a visual deterrent and to be available for quick response.

The parties have offered no evidence regarding any actions taken or events that occurred after Wednesday, January 23, 2008, other than, tragically, on Monday, January 28, 2008, Byrd murdered Kaitlyn and then killed himself. Sudberry's response to the City's motion for summary judgment states, "Kaitlyn walked home from school the following week and was shot to death by Byrd, just yards from her front door," without evidentiary citation.

Sudberry's expert states that he "reviewed all police reports (including supplements), deposition transcripts, witness statements, photographs, journals, incident reports, drawings and other documents relevant to this case," and found "no indication in the records [he] reviewed that the City of Phoenix Police Department made any effort, whatsoever, to locate and apprehend Daniel V. Byrd, after January 23, 2008." In its reply, the City's affidavit states only that on January 23, 2008, the misdemeanor threat report generated in this case was assigned to a Police Assistant in the Violent Crimes Bureau for follow-up investigation. The City does not contend that efforts to locate and apprehend Byrd were made after January 23, 2008. Therefore, for the purpose of this summary judgment decision, the Court presumes the Phoenix Police Department made no further efforts to locate and apprehend Byrd after January 23, 2008.

On January 27, 2009, Kaitlyn's father, Richard Sudberry ("Sudberry"), individually, on behalf of all statutory beneficiaries, and as the Personal Representative, initiated this case in the Maricopa County Superior Court. On April 16, 2009, Defendants State of Arizona, Cynthia Mancinelli, and John Doe Mancinelli removed the case to this Court.

## III. Evidentiary Objections and Motions to Strike Evidence Supporting or Opposing Summary Judgment

LRCiv 7.2(m)(2) permits objections to the admission of evidence offered in support of a motion for summary judgment.

Sudberry objects to the facts contained in paragraphs 22 and 23 of the City's statement of facts as inadmissible speculation. (Doc. # 54.) Paragraph 22 states, "If Byrd had been located, officers might have encountered a barricade situation in which Byrd refused to come outside." Paragraph 23 states, "If Byrd had been located, officers might have encountered a situation involving a shootout between officers and Byrd." These paragraphs refer to Sergeant Heinrich's deposition testimony explaining why he sent five officers to arrest Byrd. The City cited these paragraphs to show that it cannot be assumed that if the City found Byrd, they necessarily would have been able to apprehend him. Sergeant Heinrich's testimony is not necessary to make their point, and both their point and Sergeant Heinrich's testimony have little or no separate probative value. However, the City did not respond to Sudberry's motion to strike these paragraphs. Therefore, Sudberry's objection is sustained.

The City objects to Charles Fraas's affidavit because Sudberry failed to disclose Fraas as an expert witness pursuant to the case scheduling order. (Doc. # 66.) Sudberry's deadline for full and complete expert disclosure was extended to February 4, 2010, based on a joint motion for extension agreed to by the City. (Doc. # 51.) Sudberry filed his response, including Fraas's affidavit, to the City's motion for summary judgment on January 20, 2010, two weeks before his expert disclosure was due. (Doc. # 53.) Therefore, Fraas's affidavit will not be stricken for failure to provide timely expert disclosure. The City also argues that Fraas's affidavit sets forth only ultimate facts and conclusions of law, which cannot defeat a motion for summary judgment. Although the affidavit opines regarding the City's duty and breach of that duty, it does not address causation or gross negligence requirements, which are not otherwise established.

Therefore, the City's objection to Fraas's affidavit is overruled, but whether the affidavit is considered does not affect determination of the City's motion for summary judgment.

Defendant Cynthia Mancinelli objects to the City's separate statement of facts relying on unauthenticated police reports, which include purportedly inadmissible hearsay and hearsay within hearsay, although she does not oppose the City's motion for summary judgment. (Doc. # 55.) Defendant State of Arizona objects to Plaintiffs' reliance on those same unauthenticated police reports. (Doc. # 63.) The State and Mancinelli join each other's objections. (Doc. ## 58, 64.) Subsequently, the City filed a declaration by the custodian of records for the Phoenix Police Department authenticating the reports attached to the City's statement of facts.

Only admissible evidence can be considered in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(e). Although "unauthenticated documents cannot be considered in a motion for summary judgment," *Orr v. Bank of America*, 285 F. 3d 764, 773 (9th Cir. 2002), neither the City nor Sudberry challenge the authenticity of the police reports or object to their use for the purpose of this motion for summary judgment, which does not involve Mancinelli or the State. Law enforcement records setting forth "factual findings resulting from an investigation made pursuant to authority granted by law" may be admissible under the public records exception to the general exclusion of hearsay "unless the sources of information or other circumstances indicate lack of trustworthiness." *United States v. Sims*, 617 F.2d 1371, 1377 (9th Cir. 1980); Fed. R. Evid. 803(8). No one contends that the Phoenix Police Department or any of the officers who prepared the police reports were unreliable or untrustworthy. Further, there is no embedded hearsay in the context of the City's motion for summary judgment because the police reports are used to prove what the Phoenix Police Department knew or should have known, including what its officers were told by others, and not to prove the truth of the information gathered by the officers. *See id.* at 1376 ("It goes without saying that the broad exclusion of the hearsay rule has no bearing on those statements which are not

offered to prove the truth of the matter asserted therein."). The objections by Mancinelli and the State, therefore, are overruled.

**IV.     Analysis**

The Complaint includes three counts:  (1) Wrongful Death – A.R.S. § 12-611, *et seq.*; (2) Survival Action – A.R.S. § 14-3110, *et seq.*; and (3) Civil Rights Violation – 42 U.S.C. § 1983) (against only Defendant Cynthia Mancinelli).  When a person's death is caused by a wrongful act, neglect, or default that would have entitled the deceased person to maintain an action to recover damages if the person had not died, the person or corporation that would have been liable if death had not ensued shall be liable to an action for damages.  A.R.S. § 12-611.  A wrongful death action survives the death of the person entitled to recover damages under the action and may be asserted by the personal representative of such person.  A.R.S. § 14-3110.  Thus, Counts One and Two together plead one cause of action against all Defendants, and Count Three is not pled against the City.

**A.     Law Enforcement Liability**

To establish a claim for negligence, a plaintiff must prove four elements:

> (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages.  Thus, a negligence action may be maintained only if there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm.

*Vasquez v. Arizona*, 220 Ariz. 304, 311, ¶ 21, 206 P.3d 753, 760 (Ct. App. 2008) (internal quotation marks and citations omitted).  When a municipality chooses to provide police protection, it has "a duty to act as would a reasonably careful and prudent police department in the same circumstances."  *Id.* at 313, ¶ 29, 206 P.3d at 762 (quoting *Austin v. City of Scottsdale*, 140 Ariz. 579, 581-82, 684 P.2d 151, 153-54 (1984)).  But a municipality does not have a duty to protect each of its citizens from all harms.  *Austin*, 140 Ariz. at 582 n.2, 684 P.2d at 154 n.2.  "By establishing a police department, a

municipality becomes neither a general insurer of safety nor absolutely liable for all harms to its citizens." *Id.*

In *Austin*, when an anonymous caller told the Scottsdale Police Department dispatcher the name of a potential victim and where and when he may be in danger, the dispatcher looked in the city telephone directory and, finding no person with that name listed as living where the caller said the potential victim would be, the dispatcher did nothing further regarding the call. *Id.* at 579-80, 684 P.2d at 151-52. The Scottsdale Police Department violated its own procedure for handling emergency telephone calls requiring immediate attention and assignment to the most readily available unit and acknowledged it should have attempted to inform the victim or his family of a threat. *Id.* at 140 Ariz. at 582, 684 P.2d at 154. *Austin* concluded that a reasonable jury could find that the City of Scottsdale breached its duty by not doing more than it did. *Id.* Relying on *Austin*, Sudberry contends that "a reasonably careful and prudent police department in the same circumstances would have done more" after January 23, 2008, to apprehend Byrd before Kaitlyn's death on January 28, 2008. *See id.*

However, *Austin*, published June 14, 1984, was partially superseded by A.R.S. § 12-820.02, effective August 3, 1984,[1] which provides the City with qualified immunity for specific acts or omissions:

> Unless a public employee acting within the scope of the public employee's employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for:
>
> 1.    The failure to make an arrest or the failure to retain an arrested person in custody.
>
> . . . .
>
> 3.    An injury resulting from the probation, community supervision or discharge of a prisoner or a youth committed to the department of juvenile corrections, from the terms and conditions of the prisoner's or youth's probation or community supervision or from the revocation of the

---

[1] A.R.S. § 12-820.02 was added by Arizona Laws 1984, Ch. 285, § 3, in the Second Regular Session of the 36th Legislature, with an effective date of August 3, 1984.

- 9 -

prisoner's or youth's probation, community supervision or conditional release.

A.R.S. § 12-820.02. Sudberry agrees that the City is liable here only if the facts demonstrate that the Phoenix Police Department was grossly negligent in its handling of Byrd's threats toward Kaitlyn's life.

"A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Arizona Dep't of Public Safety*, 170 Ariz. 591, 595, 826 P.2d 1217, 1221 (Ct. App. 1991). Gross negligence "fairly proclaims itself in no uncertain terms." *Id.* "It is flagrant and evinces a lawless and destructive spirit." *Id.* Whether gross negligence exists "may be resolved on summary judgment if no evidence is introduced that would lead a reasonable person to find gross negligence." *Id.*; *accord Badia v. City of Casa Grande*, 195 Ariz. 349, 356, ¶ 27, 988 P.2d 134, 141 (Ct. App. 1999). To defeat summary judgment, the evidence of gross negligence must be "more than slight" and not "border on conjecture." *Badia*, 195 Ariz. at 356, ¶ 27, 988 P.2d at 141.

### B. *Badia v. City of Casa Grande*

In *Badia*, Ida Perez was arrested around 9:45 p.m. after a police officer had seen her back her truck into a parked vehicle. *Id.* at 350, ¶ 2, 988 P.2d at 135. Perez's boyfriend and a female relative of Perez were passengers in the truck at the time of the arrest. Perez was charged with various misdemeanor offenses, including driving with a suspended license, driving under the influence of alcohol, and resisting arrest. After processing, a police dispatcher telephoned Perez's relative to inform her that Perez would be released and wanted the relative to pick her up without the boyfriend. Although the relative conveyed that information to the boyfriend, he accompanied the relative to the police substation. When they arrived at the substation, sometime before 1:00 a.m., the dispatcher immediately released Perez to her relative, who was with Perez's boyfriend.

- 10 -

While still inside the substation, Perez and her boyfriend began arguing and pushing each other, which they continued into the parking lot outside the substation. A toxicology report showed Perez's blood alcohol level was between .24 and .26 percent when she left the police substation. *Id.* at 357, ¶ 29, 988 P.2d at 142.

Perez's relative, who did not drink at all that night, drove Perez and her boyfriend directly to a convenience store because Perez wanted to purchase more beer. *Id.* at 351, ¶ 8, 988 P.2d at 136. Perez and her boyfriend then resumed their drinking. At some point Perez told her relative that she had told the police she did not want her boyfriend to pick her up and he had threatened to kill her a month earlier. Within approximately two hours after Perez was released, her boyfriend stabbed her to death at her apartment. *Id.*

The plaintiff's police procedures expert opined that the police department and officers grossly violated generally accepted police custom and practice in several respects, proximately causing Perez's death. The appellate court affirmed summary judgment in favor of defendants, concluding:

> The record does not establish, nor could a trier of fact reasonably infer, that Perez's sobriety level or defendants' other alleged violations of police custom and practice proximately caused [the boyfriend] to attack Perez, which resulted in her death. Sheer speculation is insufficient to establish the necessary element of proximate cause or to defeat summary judgment.
>
> Moreover, the police procedures expert's opinions are neither binding nor determinative. Expert opinions, without more, do not necessarily render a plaintiff's allegations of gross negligence triable issues of fact. That is particularly so when, as here, the expert's opinions on the issues of gross negligence and causation are largely conjectural and conclusory.
>
> . . . .
>
> Viewing all the evidence in the light most favorable to plaintiff, we conclude that a reasonable trier of fact could not find gross negligence in this case. Plaintiff failed to present any evidence that defendants "act[ed] or fail[ed] to act" knowing or objectively having reason to know that their actions "create[d] an unreasonable risk of bodily harm to [Perez] . . . [and] involve[d] a high probability that substantial harm [would] result." In addition, based on this record, a reasonable trier could not find that defendants' alleged acts or omissions proximately caused Perez's death.

*Id.* at 357, ¶¶ 29-33, 988 P.2d at 142 (footnote and citations omitted).

**C.**   ***McCleaf v. Arizona***

In *McCleaf*, Josie Sanchez was sentenced to three years intensive probation after pleading guilty to one count of possession of a dangerous drug, a class four felony. 190 Ariz. 167, 168, 945 P.2d 1298, 1299 (Ct. App. 1997). The terms of probation included obeying all laws, abstaining from alcohol and drugs, obeying a curfew schedule, and refraining from associating with criminals, probationers, parolees, and drug users. Sanchez violated probation on November 26, 1987, December 14, 1987, and March 9, 1988. *Id.* at 169, 945 P.2d at 1300. Although Sanchez previously had been required to take frequent random urinalysis tests, none were required between April 4, 1988, and September 7, 1988. In August or September 1988, a newly hired probation officer with no prior experience as a probation officer and only a one-week training session was assigned to Sanchez's case.

On September 7, 1988, Sanchez accompanied another probationer to a potential heroin purchase where they did not obtain heroin, but did purchase and consume a quantity of alcohol. Inebriated, Sanchez drove a jeep into a stucco fence. When police officers administered field sobriety tests to Sanchez, they noted she was almost too intoxicated to stand. She became disorderly and uncooperative and had to be handcuffed and forced into a patrol car. Subsequent testing indicated Sanchez's blood alcohol content to be more than twice the legal limit. Because Sanchez misled investigating officers as to her true identity, the officers did not learn she was on intensive probation and released her after citing her for driving under the influence of alcohol.

Later that evening, Sanchez contacted her surveillance officer and admitted to the citation for driving under the influence of alcohol. The surveillance officer reported the incident to her probation officer, who filed a petition to revoke probation. The petition recommended the court issue a summons requiring Sanchez's attendance at the revocation arraignment rather than issuing an arrest warrant. She made her initial appearance September 19, 1988, and, on September 29, 2008, admitted to all the violations except one. Her disposition hearing was scheduled for October 19, 2008, and she remained out of custody, by court order, pending disposition.

In the early afternoon of October 14, 1988, Sanchez accompanied another probationer to purchase alcohol. After a day of heavy drinking, she crashed the Cadillac she was driving into two parked cars. Shortly thereafter, she disregarded a stop sign and collided with a small Chevrolet. The collision killed the driver's six-year-old son and injured the driver and her ten-year-old daughter.

The driver brought an action against the state, claiming gross negligence in its supervision of Sanchez's probation and in its failure to take her into custody following her probation violation. The driver alleged that, but for the state's gross negligence, Sanchez would have been in custody on October 14, and thus would not have killed her son and injured her and her daughter. The trial court directed a verdict in favor of the state, holding that there was insufficient evidence of gross negligence and insufficient evidence that any of the state's purported negligent acts were the proximate cause of the accident. *Id.* at 170, 945 P.2d at 1301. The appellate court affirmed, holding that the judge's decision not to incarcerate Sanchez became a superseding cause of harms to the plaintiff and precluded assignment of liability to the probation officers.

In addition, the plaintiff asserted that the probation officers' supervision of Sanchez while she was on intensive probation and the state's hiring and assignment of the inexperienced probation officer was negligent. The appellate court found the directed verdict to be proper because to do otherwise would have required the jury to speculate on causation:

> In order to find that different supervisory measures would have prevented the fatal accident, the jury would have had to speculate that the alternative measures would have been successful. Plaintiff did not prove that other programs, or a different probation officer, would have kept Sanchez from reoffending.

*Id.* at 172, 945 P.2d at 1303.

**D.    Gross Negligence**

Sudberry's police procedures expert opined that "for more than 4 days following January 23, 2008, the City of Phoenix Police Department failed to act in a reasonable and careful manner to protect Kaitlyn Sudberry from a specific threat of lethal harm from an

- 13 -

identified potential perpetrator" and "the Phoenix Police Department's failure to make any effort, whatsoever, to locate and detain Daniel V. Byrd after January 23, 2008, particularly in light of the potentially lethal nature of his threats, constituted a gross deviation from the standard of care that would have been exercised by a careful and prudent police department under similar circumstances." But expert opinions do not necessarily establish triable issues of fact, particularly where, as here, the expert's opinions are largely conjectural and conclusory. *See Badia*, 195 Ariz. at 357, ¶ 30, 988 P.2d at 142.

Sudberry does not dispute the care with which the Phoenix Police Department conducted its investigation before January 24, 2008. Before January 24, 2008, the Phoenix Police Department notified Kaitlyn and her family of the threat, including suggesting to Kaitlyn's stepmother to keep Kaitlyn home from school. Police officers went to Byrd's residence four different times but were unable to find him. A police officer contacted Byrd's probation officer. Police officers were stationed at Kaitlyn's school for two days. Sudberry offers no basis for concluding that failing to conduct further investigation from Thursday, January 24, 2008, through Sunday, January 27, 2008, demonstrates flagrant negligence that "fairly proclaims itself in no uncertain terms." Based on this record, the Phoenix Police Department did not ignore or disregard the threat of harm to Kaitlyn or flagrantly demonstrate "a lawless and destructive spirit." *See Walls*, 170 Ariz. at 595, 826 P.2d at 1221.

Further, the police did not increase the risk of harm to Kaitlyn. They did not induce Kaitlyn's reliance on police protection; rather, they suggested that Kaitlyn's family obtain an order of protection and keep her home from school. They did not release her in a vulnerable condition to the custody of someone who had threatened to kill her. They did not leave her alone without safe transportation or injured without medical assistance. By failing to apprehend Byrd before he harmed Kaitlyn, the Phoenix Police Department certainly did not reduce the risk of harm, but also did not increase the risk of harm.

Thus, a reasonable jury could not conclude that the Phoenix Police Department's failure to "take any steps to locate or apprehend Byrd after January 23, 2008," constitutes gross negligence.

### E. Proximate Causation

"Sheer speculation is insufficient to establish the necessary element of proximate cause or to defeat summary judgment." *Badia*, 195 Ariz. at 357, ¶ 29, 988 P.2d at 142. Sudberry's police procedures expert opined that "a reasonably careful and prudent police department in the same circumstances" would have: (1) assigned a detective to immediately conduct a follow-up investigation; (2) informed both uniform officers and investigative personnel of the urgency to locate and apprehend the suspect; (3) used joint shift briefings for patrol and criminal investigative personnel to keep apprised of efforts to locate and apprehend the suspect; (4) contacted the suspect's family members, acquaintances, classmates, etc.; (5) maintained ongoing contact with Kaitlyn and her family; and (6) attempted to gain access to the suspect's known residence to establish whether lethal weapons were present. Completing any or all of the foregoing actions may have increased the likelihood of apprehending Byrd, but predicting that the police would have apprehended Byrd and prevented Kaitlyn's death if only they had conducted some or all of the foregoing actions requires sheer speculation. *See McCleaf*, 190 Ariz. at 172, 945 P.2d at 1303.

Arizona law, as narrowly drawn by the legislature, leaves little play for shifting the costs of crime to police agencies. Even the depth of tragedy in this case cannot override the rule of Arizona law.

IT IS THEREFORE ORDERED that Defendant City of Phoenix's Motion for Summary Judgment (doc. # 47) is granted.

DATED this 20th day of April, 2010.

_____
Neil V. Wake
United States District Judge